PAUL J. FISHMAN
United States Attorney
By: MARK C. ORLOWSKI
Assistant U.S. Attorneys
970 Broad Street, Suite 700
Newark, New Jersey 07102
(973) 645-2760
Attorney for the Plaintiff,
United States of America

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. |
| | : | |
| v. | : | |
| | : | **COMPLAINT** |
| JHJ ENTERPRISES, LLC, OMEGA | : | |
| SERVICE MAINTENANCE | : | |
| CORPORATION, JORGE E. TAYLOR,: | |
| JORGE B. TAYLOR, and ROBERT | : | |
| STAPLETON, | : | |
| | : | Document Electronically Filed |
| Defendants. | : | |
| | : | |

Plaintiff, United States of America (the "United States"), by its attorney, Paul

J. Fishman, United States Attorney for the District of New Jersey, and Mark C.

Orlowski and J. Andrew Ruymann, Assistant United States Attorneys, by way of

this Complaint against defendants JHJ Enterprises, LLC ("JHJ"), Omega Service

Maintenance Corporation ("Omega"), Jorge E. Taylor ("Taylor"), Jorge B. Taylor

("JB Taylor"), and Robert Stapleton ("Stapleton")(collectively "Defendants"), alleges

as follows:

## JURISDICTION AND VENUE

1.     The United States brings claims of fraud, unjust enrichment, and payment by mistake under the common law, and claims under the False Claims Act, 31 U.S.C. §§ 3729-3733, arising from the submission of false claims in connection with government contracts between JHJ and the United States, which were awarded in part because JHJ held itself out as a service-disabled veteran-owned small business ("SDVOSB").

2.     The United States District Court for the District of New Jersey has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1345, which provides for original jurisdiction of civil actions commenced by the United States of America, or by any agency or officer expressly authorized to sue.

3.     This Court has personal jurisdiction and venue over defendants pursuant to 31 U.S.C. § 3732(a) because Defendants JHJ, Omega, and Taylor are located and transact business within New Jersey, and because the relevant conduct of Defendants, including acts proscribed by 31 U.S.C. § 3729 occurred in this district.

## PARTIES

4.     Plaintiff is the United States of America.

5.     Defendant JHJ is a privately owned company that is, and was at all relevant times, located in New Jersey.  JHJ's listed address is 11 Evergreen Avenue, Neptune, New Jersey 07753.

6.      Defendant Omega is a privately owned company that is, and was at all relevant times, located in New Jersey.  Omega's listed address is 11 Evergreen Avenue, Neptune, New Jersey 07753.

7.      Defendant Taylor is a resident of the State of New Jersey, and at all times relevant herein, maintained an ownership interest in both JHJ and Omega.

8.      Defendant JB Taylor is a resident of Costa Rica, and at all times relevant herein, was employed or associated with either JHJ and/or Omega in New Jersey.

9.      Defendant Stapleton is a resident of the State of New York.  At all times relevant herein, Stapleton purportedly maintained an ownership interest in JHJ.

## SUMMARY OF ALLEGATIONS

10.     By this action, the United States brings claims under the False Claims Act against Defendants for damages and civil penalties, common law fraud, unjust enrichment, payment by mistake, and a claim alleging that Omega is liable for actions taken by JHJ because they are alter egos of one another.

11.     Defendants circumvented small business set aside requirements in federally-funded contracts requiring ownership and control by a service-disabled veteran by improperly representing that defendant JHJ was owned and controlled by a service-disabled veteran, and while misrepresenting compliance with the requirements of those set aside contracts, sought, received, and retained payments issued by the Government.

## <u>SUMMARY OF LAW AND THE SDVOSB PROGRAM</u>

12.     The False Claims Act provides that any person who presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States, or knowingly makes, uses or causes to be made or used false records and statements to induce the United States to pay or approve claims, is liable for civil penalties for each such claim, plus three times the amount of the damages sustained by the United States.

13.     The False Claims Act defines "knowingly" to include acts committed with "actual knowledge," as well as acts committed "in deliberate ignorance" or "reckless disregard" of their truth or falsity.  Liability attaches when a defendant seeks, or causes others to seek, payment that is unwarranted from the United States.

14.     Pursuant to Public Laws 109-461 and 108-831, Congress has enacted set aside programs to award Government contracts to small businesses owned by service-disabled veterans. <u>See</u> 38 U.S.C. § 8127 and 15 U.S.C. § 657f.

15.     In order for a small business to qualify as an SDVOSB, a veteran must own 51 percent or more of the small business and control the daily business operations, unless the veteran is so totally disabled by permanent disabilities that they are unable to manage the daily business operations. <u>See</u> 38 U.S.C. § 8127 and 13 C.F.R. § 125.8.

16.     The Center for Veterans Enterprise[1] ("CVE") is an office within the Department of Veterans Affairs that helps VA contracting offices identify veteran-owned small businesses. See 38 C.F.R. § 74.1.

17.     CVE's primary function is to provide verification to SDVOSB's and veteran-owned small businesses generally ("VOSB"), who are seeking to do business with the United States Department of Veterans Affairs.

18.     CVE evaluates and verifies the ownership and control of SDVOSB's in accordance with 38 C.F.R. Part 74.

19.     An SDVOSB is defined by regulation as a small business "not less than 51 percent of which is owned by one or more service-disabled veterans . . . the management and daily business operations of which are controlled by one or more service-disabled veterans, or in the case of a veteran with a permanent and severe disability, a spouse or permanent caregiver of such veteran." 38 C.F.R. § 74.1; see also 13 C.F.R. § 125.8.

20.     Control means both the day-to-day management and long-term decision making authority for the SDVOSB.  See 38 C.F.R. § 74.4(a); see also 13 C.F.R. §§ 125.10 and 125.13.

21.     Veterans purporting to control an SDVOSB must "possess requisite management capabilities" and demonstrate "sustained and significant time invested in the business."  38 C.F.R. § 74.4(c)(1); see also 13 C.F.R. § 125.13.

---

[1] Effective September 30, 2013, the Center for Veterans Enterprise was renamed the Center for Verification and Evaluation.

22.     In the case of a limited liability company, the veteran(s) must have control over all decisions of the limited liability company. See 38 C.F.R. § 74.4(e) and 13 C.F.R. § 125.13.

23.     "Non-veterans who transfer majority stock ownership or control of the firm to an immediate family member within 2 years prior to the [application as a VOSB] and remain involved in the firm as a stockholder, officer, director, or key employee of the firm are presumed to control the firm."  38 C.F.R. § 74.4(h).

24.     The presumption that the non-veteran is controlling the firm can be rebutted by demonstrating "that the transferee has independent management experience necessary to control the operation of the firm, and indeed is participating in the management of the firm." See 38 C.F.R. § 74.4(h).

25.     Additional factors to be considered in determining whether a non-veteran is found to be controlling the entity are (1) whether the non-veterans control the board of directors, (2) a non-veteran or entity provides critical financial or bonding support, (3) a non-veteran or entity controls the veteran through loan arrangements, and (4) business relationships with non-veterans cause such dependence that the veteran cannot exercise independent business judgment without great risk.  See 38 C.F.R. § 74.4(i).

## FACTUAL ALLEGATIONS

### The Parties

26.     JHJ initially originated as a limited liability company in the State of New Jersey in February, 1999.

27.     The initials in JHJ represent the first letter of the first names of Defendant Jorge E. Taylor, and his two sons, Henry and Jorge.

28.     In or around February, 2006, JHJ issued a stock certificate certifying that Defendant Taylor was the 100% owner of JHJ.

29.     Defendant Taylor was at all times relevant herein the majority owner and President of Defendant Omega.

30.     Defendant Taylor was also at all times relevant herein the majority owner and President of a third related company, Taylor Mechanical, with a business address of 11 Evergreen Avenue, Neptune, New Jersey 07753.

31.     Defendant Omega is a business primarily engaged in the business of general contracting, specializing in construction and facilities maintenance services.

32.     Defendant Stapleton is the brother-in-law of Defendant Taylor.

33.     Defendant Stapleton is a veteran of the United States Army and the United States Marine Corps, who has been adjudicated a service-disabled veteran with a 130 percent disability.

34.     Since approximately 1988, Defendant Stapleton has lived in Lexington, New York, approximately 180 miles from JHJ's principal place of business in Neptune, New Jersey.

35.     Defendant Stapleton ceased his employment as a builder in 1986 following a motor vehicle accident, and was not employed by anyone until he became involved with JHJ in 2008.

**Defendant Stapleton's Involvement with JHJ**

36.     JHJ was formed as a business in or around February, 2006, with Defendant Taylor as a 100% owner of the company.

37.     At all times relevant herein, JHJ's corporate records have been maintained by Defendant Taylor.

38.     At some time prior to November, 2008, Defendant Taylor determined that he wanted to bid on government contracts set aside for SDVOSBs.

39.     In or around November, 2008, Defendant Taylor directed an Omega employee, Chi Man Cheung, to research the SDVOSB program requirements.

40.     Defendant Taylor approached Defendant Stapleton in 2008, advised him that he discovered that disabled veterans could bid construction jobs for the United States government, and asked Defendant Stapleton if he could use extra money.

41.     Subsequently, on or about November 5, 2008, Defendant Taylor purportedly transferred a 51% ownership interest in JHJ to Defendant Stapleton for the sum of $3,000.

42.     Defendants Taylor and Stapleton initially agreed that Defendant Stapleton would be paid $350 a week for his participation in JHJ's business operations.

43.     Defendant Stapleton did not prepare any of the paperwork to certify JHJ as an SDVOSB.

44.     In order to certify as an SDVOSB, Defendant Taylor's son JB Taylor completed the necessary forms, and then directed Chi Man Cheung to enter the information on the forms into the necessary computer databases.

45.     Defendant Stapleton never provided any of the information entered into the government databases to certify JHJ as an SDVOSB.

46.     JB Taylor was entered as the authorizing official of JHJ on the government websites when JHJ was attempting to certify as an SDVOSB.

47.     The determination of the amount of any bonuses paid to Defendant Stapleton or others in conjunction with JHJ's profits was made by Defendant Taylor.

48.     Defendant Stapleton did not pay Defendant Taylor $3,000 in conjunction with the transfer of a 51% ownership interest to Defendant Stapleton.

49.     With respect to hiring employees, Defendant Taylor reviewed resumes and conducted all of the interviews of potential employees.

50.     Defendant Taylor made all of the hiring decisions in hiring employees for JHJ.

51.     Although Defendant Taylor claims that he discussed his hiring decisions with Defendant Stapleton, Defendant Stapleton never objected to a hiring decision, and did not ask any questions about the personnel that Defendant Taylor decided to hire.

52.     Although Defendant Stapleton believes that his office door at JHJ had a lock, he did not have a key for that office.  The key to Defendant Stapleton's office was maintained by Defendant Taylor.

53.     Even though JHJ had multiple contracts with the United States, Defendant Stapleton only met with government officials twice in connection with his involvement with JHJ, and Defendant Taylor met with government officials all of the other times.

54.     Defendant Stapleton did not do any marketing on behalf of JHJ.

55.     Defendant Stapleton did not make the decision on which contracts JHJ was going to bid upon.

56.     The decision on which contracts JHJ was going to bid was ultimately made by Defendant Taylor.

57.     Defendant Stapleton did not fill out any bid paperwork for contracts with the United States, and did not sign any of the bid documents.

58.     Prior to August, 2010, Defendant Stapleton only visited the JHJ office in Neptune, New Jersey, one time.

59.     Defendant Stapleton only went to the bank once in conjunction with his ownership of JHJ, purportedly to sign some papers.

60.     Defendant Stapleton never went to the bank following the initial trip, and never made deposits or withdrawals.

61.     The bank statements did not go to Defendant Stapleton, but were instead sent to the JHJ offices.

62.     Defendant Stapleton did not maintain online access to JHJ's bank accounts.

63.     Defendant Stapleton never reviewed the bank statements on a monthly basis for JHJ.

64.     Defendant Stapleton did not maintain a checkbook for JHJ.

65.     During the operation of JHJ, Defendant Stapleton signed payroll checks approximately 10 times, while Defendant Taylor signed all of the rest of the payroll checks, approximately 90 times.

66.     A corporate e-mail account for Defendant Stapleton was provided by the company, but Defendant Stapleton never used that e-mail account, and did not have access to it.

67.     Defendant Taylor and other employees of JHJ had access to Defendant Stapleton's e-mail account.

68.     Defendant Stapleton never maintained any of JHJ's corporate records.

**JHJ Improperly Obtained SDVOSB Set Aside Contracts**

69.     At all times relevant herein, Defendant Stapleton did not own and/or control JHJ.

70.     JHJ was actually owned and/or controlled by Defendant Taylor.

71.     Accordingly, JHJ was not qualified to bid on SDVOSB set aside contracts being issued by the United States.

72.     Even though JHJ was not qualified to bid on SDVOSB set aside contracts, Defendants nevertheless bid on and received SDVOSB contracts.

11

73.     The United States, in reliance upon JHJ's false statements, granted JHJ multiple SDVOSB contracts, including but not limited to, a contract at the Brooklyn VA hospital to both replace sidewalks and upgrade a ventilation system (contracts VA243RA0819 and VA243RA0918), contracts at the East Orange VA hospital to perform HVAC work (contracts VA243RA0789 and VA243RA0342), a contract at the St. Albans VA to upgrade the air conditioning system (contract VA243RA0736), and a contract at the U.S. Coast Guard in Point Pleasant, New Jersey to perform HVAC work (contract HSCG8310CPCU039) (collectively, the "Contracts").

74.     JHJ was not entitled to receive the SDVOSB contracts that it improperly obtained from the United States.

75.     By virtue of the fact that JHJ improperly obtained SDVOSB contracts from the United States, its actions deprived other, legitimate SDVOSB companies from receiving the work.

76.     JHJ performed work on each of the Contracts.

77.     After performing work on the Contracts, JHJ and/or its agents, representatives or employees, submitted progress payment requests, along with invoices, to seek payment on the Contracts from the United States.

78.     The progress payments included a certification from JHJ representatives that the requested payments were "in accordance with the specification, terms and conditions of the contract."

79.     The certification signed by JHJ representatives constituted a false statement to the United States because JHJ was not a legitimate SDVOSB.

80.     In reliance upon the Contracts, and JHJ's false certifications, the United States paid JHJ in excess of $8 million in connection with the completion of the Contracts.

81.     JHJ was not entitled to be paid under the Contracts because Defendants obtained them through false statements and fraudulent conduct.

82.     Accordingly, both the United States and other service-disabled veterans were damaged by the conduct of Defendants.

**The Relationship Between JHJ and Omega**

83.     JHJ and Omega shared some of the same employees, including Chi Man Cheung, Gregory Hughes, and Robert Knowles.

84.     Chi Man Cheung, Gregory Hughes, and Robert Knowles were on both the JHJ payroll and the Omega payroll between 2008 and 2012.

85.     Defendant Taylor made the determination of the amount of time and which employees would be allocated to work for JHJ and/or for Omega.

86.     Defendant Stapleton was not involved in determining which of the JHJ employees would perform work for Omega.

87.     When JHJ was being formed as an SDVOSB, JB Taylor researched the requirement for making JHJ an SDVOSB during his working hours as an employee of Omega.

88.     JHJ subcontracted the majority of the work it was contracted to perform to Omega.

89.     The subcontracts to Omega from JHJ were sole sourced, and were not bid upon by other contractors.

90.     Other subcontractors hired by JHJ used a bidding process, in which JHJ generally accepted the lowest bid.

91.     JHJ and Omega shared a common address, 11 Evergreen Avenue, Neptune, New Jersey, which shared a common entrance.

92.     JHJ and Omega had a shared receptionist at their business location.

93.     The building where JHJ and Omega were situated was owned by Omega.

94.     JHJ paid rent to Omega in an amount determined by Defendant Taylor.

95.     JHJ's office and Omega's office were co-located.

96.     The space rented by JHJ from Omega was not separated from Omega's space by a locked door or other secure barrier.

97.     Omega employees thus had access to JHJ files, materials and paperwork if they wanted to access them.

98.     The bank accounts of JHJ and Omega were electronically linked, and money was able to be transferred between them.

99.     In or around January, 2010, Omega provided money to JHJ for start-up costs when JHJ first began hiring employees.

100.    Omega and JHJ purportedly entered into a loan agreement for the start-up costs, which was signed on behalf of JHJ by Defendant Taylor, who was also the majority owner of Omega.

101.    In order for JHJ to obtain bonding necessary for construction work, both Omega and Taylor Mechanical, both majority owned by Defendant Taylor, pledged assets on behalf of JHJ.

102.    While JB Taylor was working as an employee of Omega, and prior to JHJ being awarded any federal contracts, he helped JHJ obtain insurance, and bonding, and put bids together for the company, among other things.

103.    Prior to the award of any federal contract to JHJ, Omega did not bill, and JHJ never paid Omega, for the time spent by JB Taylor to obtain insurance and bonding, and put bids together.

104.    At the same time, another Omega employee, Gregory Hughes, performed work for JHJ, in that he helped prepare estimates for bids JHJ was submitting to the United States.

105.    Mr. Hughes performed that work for JHJ during his Omega working hours, and was paid by Omega, not JHJ, for his work.

106.    JHJ never reimbursed Omega for the hours spent by JB Taylor and Mr. Hughes for the work performed on behalf of JHJ during their Omega working hours.

107.    At the time that Defendant Stapleton purportedly assumed an interest in JHJ, JHJ did not have a bank account, and did not have any operating funds.

108.    Prior to performing work on its contracts, JHJ obtained insurance.

109.    Since JHJ did not have money, Omega purportedly loaned JHJ approximately four thousand dollars to pay an insurance premium.

110.    There was no interest charged on the loan between JHJ and Omega for the insurance premium.

111.    In addition, the loan was an open-ended loan with no specific time period within which JHJ had to repay the money for the insurance premium.

112.     JHJ and Omega are alter egos of one another, by virtue of the fact that, among other things, (1) JHJ and Omega shared some of the same officers and employees, (2) some of Omega's employees performed work for JHJ, for which they were paid by Omega, (3) JHJ and Omega shared a common address and work space, (4) Omega provided interest free loans to JHJ and/or gave JHJ money that was not paid back, (5) the bank accounts of JHJ and Omega were electronically linked, and (6) JHJ sole sourced to Omega numerous subcontracts on Government contracts.

113.    Because Omega is an alter ego of JHJ, Omega is liable for the acts of JHJ and its officers, directors, and employees.

## COUNT ONE

### [False Claims Act – Presenting False or Fraudulent Claims to the United States, 31 U.S.C. § 3729(a)(1)(A)]

114.    The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

115.    As set forth above, Defendants JHJ, Taylor, JB Taylor, and/or Stapleton presented to the United States for payment or approval false and

fraudulent claims, with knowledge that they were false, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity.

116.   Plaintiff United States has sustained damages as a result of the false statements of Defendants, in an amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## COUNT TWO

**[False Claims Act – Causing to Be Presented False or Fraudulent Claims to the United States, 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(C)]**

117.   The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

118.   As set forth above, in connection with the foregoing schemes, Defendants and their co-conspirators knowingly, or with deliberate ignorance or in reckless disregard for the truth conspired to submit or cause to be submitted, a false claim, or conspired to make, use or cause to be made or used false records and statements material to false and fraudulent claims that were made to the United States, and took actions to further these conspiracies.

119.   Alternatively, to the extent the False Claims Act, as it existed prior to its amendment in 2009, applies to some of the aforementioned claims, in connection with the foregoing schemes, Defendants conspired to defraud the United States by getting a false or fraudulent claim allowed or paid.

120.    By reason of these false claims, the United States has sustained damages in an amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## COUNT THREE

### [Violations of the False Claims Act – Making or Using a False Record or Statement, 31 U.S.C. § 3729(a)(1)(B)]

121.    The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

122.    In connection with the foregoing schemes, Defendants knowingly, or with deliberate ignorance or in reckless disregard for the truth, made, used or caused to be made and used, false records and statements material to false and fraudulent claims that were made to the United States.

123.    Alternatively, to the extent the False Claims Act as it existed prior to its amendment in 2009 applies, in connection with the foregoing schemes, Defendants knowingly, or with deliberate ignorance or in reckless disregard for the truth, made, used or cause to be made and used, false records and statements to get false and fraudulent claims paid or approved by the United States.

124.    By reason of the aforementioned false claims, the United States has sustained damages in an amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## COUNT FOUR

### [Common Law Fraud]

125.    The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

126.    Defendants made material misrepresentations of fact, with knowledge of, or in reckless disregard of, their truth, in connection with claims for payment submitted by, or on behalf of, Defendants, to the United States.

127.    Defendants intended that the United States rely upon the accuracy of the false representations referenced above.

128.    The United States in fact relied upon the accuracy of the false representations referenced above when it issued payments to the Defendants.

129.    The United States made substantial payments of money in justifiable reliance upon Defendants' false representations.

130.    Defendants actions caused the United States to sustain damages in an amount to be determined at trial.

## COUNT FIVE

### [Unjust Enrichment]

131.    The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

132.    By reason of the payments made to Defendants by the United States, Defendants were unjustly enriched.

133.   The circumstances of Defendants receipt of contracts as an SDVOSB, and subsequent payments by the United States are such that, in equity and good conscience, Defendants are liable to account for and pay such amounts which were paid to them that should not have been paid.

## COUNT SIX

## [Payment by Mistake]

134.   The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

135.   This is a claim for the recovery of monies paid by the United States to Defendants by mistake.

136.   The United States, acting in reasonable reliance on the accuracy and truthfulness of the information contained in the claims, paid Defendants certain sums of money to which it was not entitled, and are thus liable to account and pay such amounts back to the United States.

## COUNT SEVEN

## [Alter Ego and Mere Instrumentality of Omega]

137.   The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

138.   JHJ and Omega are alter egos of one another, by virtue of the fact that, among other things, (1) JHJ and Omega shared some of the same officers and employees, (2) some of Omega's employees performed work for JHJ, for which they were paid by Omega, (3) JHJ and Omega shared a common address and work space,

(4) Omega provided interest free loans to JHJ and/or gave JHJ money that was not paid back, (5) the bank accounts of JHJ and Omega were electronically linked, and (6) JHJ sole sourced to Omega numerous subcontracts on Government contracts, and (7) officers of Omega made decisions on behalf of JHJ.

139.    Because JHJ and Omega are alter egos of one another, Omega is liable for the actions taken by JHJ, its officers, directors, and/or employees.

140.    Omega is liable to the United States to the same extent as JHJ, for any of the actions of JHJ, its officers, directors, and/or employees, as set forth above.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States demands judgment against the Defendants for damages, civil penalties, attorneys' fees, costs, and any other relief that the Court may deem just and proper.

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney

*s/ Mark C. Orlowski*
By: MARK C. ORLOWSKI
Assistant U.S. Attorney

Dated: January 12, 2017